IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Mark Barnhart, (hereinafter referred to as your Affiant) being first duly sworn, hereby

depose and state as follows:

**PURPOSE OF THE AFFIDAVIT**

1.     Your Affiant makes this affidavit in support of an application under Rule 41 of

the Federal Rules of Criminal Procedure for a search warrant authorizing the search of a

residence located at 2377 Mount Olive Road, Bidwell, Ohio, 45614 ("SUBJECT PREMISES"),

described in detail in Attachment A.

2.     The SUBJECT PREMISES is to be searched for the items specified in Attachment

B, which items constitute instrumentalities, fruits, and evidence of violations of 7 U.S.C. §

2156(b).

3.     Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that illegal possession, training, transport, purchase, sale,

receipt and delivery of dogs intended to be used for participation in an animal fighting

venture occurred, in violation of 7 U.S.C. § 2156(b), and that animals involved in such

violations, as described in Attachment B, are located at the SUBJECT PREMISES. Your

Affiant also believes, as detailed in the facts below, that evidence, instrumentalities, and

fruits constituting violations of 7 U.S.C. § 2156(b) will be located at the SUBJECT

PREMISES.

## **AGENT BACKGROUND**

4.      Your Affiant is a Special Agent with the Office of Inspector General –
Investigations (OIG-I), United States Department of Agriculture (USDA), and has been so
employed for over thirty years.  During the aforementioned period, your Affiant has personally
participated in the criminal investigation of various individuals and organizations involved in a
variety of crimes defined under Titles 7, 18 and 21 of the United States Code.  These investigations
have included cases related to such topics as: the trafficking of Supplemental Nutrition Assistance
Program (SNAP – formerly known as the Food Stamp Program) benefits, the trafficking of infant
formula, illegal dog fighting, illegal cock fighting, gambling, the trafficking of narcotics,
racketeering, interstate transportation of stolen property, money laundering, wire fraud, mail fraud,
and conspiracy.

5.      Your Affiant has successfully completed an internship at the Federal Law
Enforcement Training Center (FLETC), Behavior Science Division, Glynco, GA, and the
mandatory basic training course for criminal investigators at the FLETC.  Your Affiant has served
as an adjunct instructor at the FLETC since 2010 specializing in the area of firearm training and
undercover training.  Your Affiant has trained federal, state, and local law enforcement personnel,
as well as animal care personnel, in the specialized areas of investigating illegal dog fighting and
illegal cockfighting.  Your Affiant has testified in state and federal courts as a subject matter expert
in dog fighting.  In addition, your Affiant has received specialized training in the area of trafficking
in SNAP benefits, trafficking in infant formula, illegal dog fighting, illegal cock fighting,
conspiracies, trafficking in narcotics, and money laundering.

2

6.     This affidavit is intended to establish the existence of sufficient probable cause for the requested warrants and does not set forth all of your Affiant's knowledge about this matter. The facts set forth in this affidavit are based upon your Affiant's personal knowledge, together with other reliable information communicated to your Affiant from other law enforcement officials familiar with the facts and circumstances of the subject investigation.

## APPLICABLE STATUTES AND

## DEFINITIONS

7.     The federal Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(f)(l).   It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7 U.S.C. § 2156(a)(l). It is also illegal to possess, train, sell, buy, transport, deliver or receive an animal for purposes of having the animal participate in an animal fighting venture. 7 U.S.C. § 2156(b).  Each of these offenses are felonies punishable by up to five years in prison. 7 U.S.C. § 2156(j); 18 U.S.C. § 49.

8.     The Secretary of Agriculture is authorized to enforce the Animal Welfare Act, which provides that "[t]he Secretary or any other person authorized by him shall make such investigations as the Secretary deems necessary to determine whether any person has violated or is violating any provision of this section." 7 U.S.C. § 2156(e).

9.     The Animal Welfare Act states that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United

3

States magistrate judge within the district wherein the animal sought is located." 7 U.S.C. § 2156(e). Any U.S. marshal may apply for and execute a warrant for a violation of 7 U.S.C. § 2156.

10.     Any animal "involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States." 28 U.S.C. § 2461.

## BACKGROUND ON ANIMAL FIGHTING VENTURES

11.     In the United States, dog fighting typically involves pit bull-type dogs which dogfighters prefer for their compact muscular build, short coat, and the aggression that some display toward other dogs.  A dogfight occurs when two dogs are released by their owners or handlers in a controlled environment, to attack each other and fight.  The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs suffer extreme injuries that do not allow them to continue.  Often, the fighting dogs die from the extreme injuries encountered in a fight.

12.     Dogfighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits.  Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury.  Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the "bloodline" of these dogs for fighting purposes.

13.     The most common way that a dogfighter tests a particular dog to ascertain whether the dog is "game" is to "roll" the dog.  A "roll" is a dogfight conducted for purposes of "game-testing" rather than for wagering.  "Roll" fights generally last from five to fifteen minutes, at which

4

point the handlers usually stop the fight.  However, "roll" fights can result in serious injury or death to one or both dogs.

14.    Not all dogs in a litter of puppies bred from fighting dogs will show inclination to fight.  Dogfighters refer to dogs who do not demonstrate fighting instinct by the time they reach maturity as a "cur", "cold" or "shy."  To avoid public scrutiny, dogfighters typically do not sell these dogs to non-dogfighters or take them to an animal shelter.  Because such dogs have no value to a dog-fighting enterprise, they are often "culled" or killed.  Your Affiant is aware of dog-fighting subjects of investigation having killed dogs by shooting them, strangling them, bludgeoning them, drowning them, electrocuting them, or by not feeding and caring for them on their chain until they die of starvation or succumb to wounds received in a "roll" or fight.

15.    It is a common practice for those involved in conditioning and exhibiting fighting dogs to possess several dogs at one time.  This practice is followed for several reasons.  First, dogfighters maintain a stock of dogs at different weights and both sexes because, in dogfights, dogs are matched against other dogs to an agreed upon weight against dogs of the same sex. Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight meets the requirements for a match solicited by an opponent.  Second, dogfighters also maintain multiple dogs to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog-fighting "bloodline."

16.    Further, dogfighters must possess an inventory of dogs because dogs often die from their wounds or are badly injured during fights.  Possessing multiple dogs also increases the prospects of owning a dog who will become a Champion or Grand Champion.  Dogfighters also routinely test and "roll" their dogs, including against their own dogs.

17.     Dogs that lose fights or fail to show "gameness" are often killed.  It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

18.     Dogfights typically involve consistent practices leading up to and during the fight. Fighting dog owners or handlers enter into a verbal or written contract with their opponent several weeks before the dogfight, often referred to as a "match" or "show."  The owners or handlers agree upon: (1) the sex and weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a guarded secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

19.     It can be challenging for dogfighters to find an opponent with a dog of the same weight and sex who is looking to fight that dog at the same time of year, and for a wager that is mutually agreeable to both parties.  For that reason, dogfighters rely heavily on each other and on extensive networks of contacts to find an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year.  The practice is known as "calling out a weight."  Dogfighters often "call out a weight" to known dogfighters in several states, to increase their odds of finding a match.  "Calling out a weight" is done by telephone, text message, e-mail, or other electronic communication.  Many dogfights would not occur without this practice.

20.     Once a dogfighter locates an opponent and agrees upon terms, the match is "hooked," or set up.  The dog then undergoes a conditioning process that dog handlers refer to as a "keep."  A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a conditioning program including: treadmills used to run and exercise the dogs away from

6

public view; weighted chains and pulling devices used to increase the dog's strength and stamina; the use of devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; water-based conditioning such as tethering a dog to a cable running across a pool; and the administration of drugs, legal and illegal, including steroids to build muscle mass and aggression.

21.     Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches, requiring close attention to a dog's routine. Conditioning can take place in a dogfighter's "yard" or indoors away from public view, such as in a basement.

22.     Dog fighters fight their dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs. A "Champion" dog has won three contract fights. A "Grand Champion" dog has won five consecutive contract matches without a loss.

23.     It is common for successful dog fighters to sell Champion and Grand Champion dogs to other dog fighters and to breed and sell puppies from these dogs to other dog fighters.

24.     In order to get a dog or puppy to the new owner, dog fighters will often employ the use of a fighting dog "transporter." Dog fighters will look for transporters that understand dog fighting and the need to transport these "fighting dogs" in such a manner that the dogs cannot interact. Transporters will often advertise their services in on-line forums used by dog fighters. In addition, dog fighters and breeders will share their "favorite" transporter with each other on these forms and by text messages.

25.      It is common for fighting dog transporters to travel extensively from state to state picking up and delivering multiple fighting dogs to numerous locations. The customers of these transporters will sometimes represent to the transporter that a dog is being transported for a specific

fight; or for a "keep," *i.e.*, to be prepared for a specific fight; or to be bred to a specific dog from a fighting "bloodline."

26.     These transporters generally do not operate as a legitimate, registered, overt business, because they are aware of the intentions of their customers, and derive their income predominantly or exclusively from those engaged in illegal activities with the dogs. Such transporters frequently charge additional fees for transporting a dog with scars or injuries, because they know they will be bearing the risk of criminal liability for possessing or transporting the dogs if they are stopped by law enforcement during the transport.

27.     Dogs used in animal fighting ventures are housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent.

28.     Dog fighters often take steps to house fighting dogs away from public view, such as by placing them in remote areas, or at the back of property lines, inside sheds, garages, barns, or basements, or by erecting tall opaque fences around areas where fighting dogs are housed.

29.     When stored outside, dog fighters routinely keep their dogs tethered to a large metal chain, attached to the ground.  Often these chains are very heavy which continually strengthens the muscles of the dogs.  The dogs are chained near each other but just outside of the reach of each other in order to maintain aggression.  The chain length is often long enough for the dog to walk in a circle; to see and bark at other dogs, in order to keep them in a state of agitation, and to enter/exit some sort of shelter.  Often, the dogs' continual circular movement on the chain wears down the area surrounding the shelters, exposing the dirt and mud.  In addition, the dog shelter is often a 50-gallon plastic barrel turned on its side with a hole cut into it for access or a minimal wooden doghouse.

8

30.    Dog fighters often use specialized tools to include, but not limited to, weighted collars, weighted leashes, heavy chains, tread mills (often human tread mills modified to hold pit bull-type dogs in place), "jenny mills", aka, "cat mills" to condition dogs, and other devices capable of being used to exercise or restrain fighting dogs.  Additional specialized tools include, but are not limited to, wooden sticks or handles, often called "bite sticks", capable of being used to pry open dogs' jaws; weight scales; and breeding stands.  Breeding stands are used to restrain the female during the mating process, when the female dog is in "heat."  The stand often consists of two main parts, a steel frame and two rubber or leather hoops. The steel frame is often adjustable and is adjusted according to the height of the specific dog.  The leather loops restrain the female dog around the neck and the abdomen.  When restrained in the stand, the female dog cannot bite the male dog during the mating process.

31.    Dog fighters, who cheat, often attempt to secrete chemical agents such as pepper-spray or "No-bite" upon their own dogs.  The chemical agent is placed onto the areas where the opposing dogs would attempt to bite.  The chemical agents act to discourage the opposing dog from biting because the chemical agents have an unpleasant taste and/or odor.   Prior to most contracted dog fighting matches, dog fighters often wash their dogs with water and milk in washtubs in the presence of other dog fighters, using buckets, pails, and sponges. The purpose of washing the fighting dogs in the presence of others is to remove any chemical agents that may have been applied to the dogs.

32.    In contracted matches, dog fighters often weigh their dogs using a digital or manual hanging scale. The purpose of weighing the dogs is to ensure that both fighting dogs are at the agreed upon weight.

33.    It is common for dog fighters to use constructed enclosures, arenas, "boxes" or "pits" within which dogs are trained and/or fought. Such enclosures may be constructed of plywood or a comparable material to form the outside wall.  Carpeting or other materials are often used for the floor of the enclosure. The carpeting or other materials used for such enclosures often display evidence of dog blood, fur, or other animal matter, which is not easily disposed of and often stays on the material for long periods of time.

34.    Dog fighters often attempt to mend the injuries of their own dogs, rather than seek veterinary attention, which might raise suspicion regarding the cause of their dogs' injuries. Dog fighters also use veterinary supplements and pharmaceuticals to enhance the fighting dogs' stamina and to keep injured dogs fighting longer.

35.    Although dogs used for fighting are often housed outside, a dog in a "keep" may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog from becoming sick or injured by other dogs before an upcoming match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a "keep" require constant exercise and monitoring, which is easier when the dog is in close vicinity rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside residences if they are injured, ill, pregnant, weaning, or if a dog fighter does not have another location to keep them or wants to keep them out of view.

36.    It is common for those operating dog fighting ventures to maintain pedigrees, books, records, ledgers, and journals relating to the purchase, transportation, sale, breeding, and conditioning of fighting dogs. These materials can be found to exist in both hard and electronic copy. Dog fighters often maintain information regarding dog-fighting activities in order to stay current with the dog fighting community. "Underground" dog fighting publications similar to

magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around the country using coded language. They also describe various "kennels" or dog breeders who raise dogs for animal fighting purposes. In addition, there are online versions of published magazines that serve the same purpose, as well as websites where dog fighters post pedigrees to demonstrate the fighting lineage of their dogs.

37.     Dog fighters routinely rely on pedigree papers to make decisions concerning the purchase, sale or breeding of terrier mix dogs.  Dog fighters rely on numerous references contained in the pedigree papers to include, but not limited to:

     a.  Breeder

     b.  Bloodline

     c.  "GR CH" (Grand Champion) – A fighting dog that has won five contracted dog-fighting matches without a loss.

     d.  "CH" (Champion) – A fighting dog that has won three contracted dog-fighting matches.

     e.  "1 XW" (1-time winner) –a fighting dog that has won one contracted match.

     f.  "1XL" (1-time loser) –a fighting dog that has lost one contracted match.

     g.  "4XW" (4-time winner) –a fighting dog that has won four contracted matches.

     h.  "5XW" (5-time winner) – a fighting dog that has won five contracted matches

     i.  "POR" (Producer of Record) - list created and maintained by a dog-fighting magazine named YOUR FRIEND AND MINE.  The list records number of wins for offspring of a Sire (father) and Dam (mother) and assigns a point system to the

11

number of wins.  The points are increased for offspring that become Champion or Grand Champion winners.

    j.   "ROM" (Register of Merit) - list created and maintained by the dog-fighting magazine named SPORTING DOG JOURNAL.  The list records the number of Champion and Grand Champion offspring that the dog produces.  A male dog must sire at least four Champion dogs and a female dog must be the dam of at least three Champion dogs to be accepted on the list.

38.    Dog fighters today tend to communicate via email, text messages, or website chat rooms dedicated to "game dogs." Dog fighters routinely schedule matches and exchange documents, tips, photographs, or videos relating to dog fighting activities via electronic means. Dog fighters exchange videos, for example, to demonstrate the strength and gameness of their dogs, thus increasing the value of their dogs.

39.    Dogfighters sometimes post dog pedigrees on the website http://www.thepitbullbible.com. Dogfighters use this as a repository for breeding information to prove, verify, and research the lineage of their dogs or dogs they are fighting against or considering buying or breeding to.  The pedigree for each dog contains an indicator of how many fights the dog has won, whether the dog is a "Champion" or a "Grand Champion," the breeding history of the dog going back four generations, and indicators of the number of fights that dogs in their "bloodline" have won.  There are also fields for "Breeder", "Owner", and "Registered Name." Some pedigrees have pictures of the dogs.  Each pedigree has a unique five-digit number that appears in the webpage internet address for that particular pedigree.

## FACTS SUPPORTING PROBABLE CAUSE

40.     Review of public filings maintained by the Ohio Secretary of State's Office, disclosed that on or about August 30, 2018, MICHAEL VALENTINE (VALENTINE) filed Articles of Organization for a Domestic Limited Liability Company known as GAMEKEEPER PROPERTY, LLC, 1261 Jackson Pike, Gallipolis, OH 45631.  On or about November 13, 2018, VALENTINE, on behalf of GAMEKEEPERS PROPERTY, LLC, filed a Trade Name Registration for GAMEKEEPER KENNELS.

41.     On or about June 22, 2019, at approximately 1:49 p.m., the Gallia County Sheriff's Office (GCSO), Gallipolis, Ohio, received a 911 call from a nurse at the Holzer Emergency Medical Center, Gallipolis, Ohio, that reported serious dog bite injuries to a child and mother.  The mother reported that she and her 5-year-old son were attacked by two dogs on the walking trail in Gallipolis, Ohio.  Upon stabilizing the wounds to the mother and child, they were later transported via helicopter to a hospital in Columbus, Ohio, due to serious dog bite injuries and broken bones.



42.     On or about June 22, 2019, from approximately 1:49 p.m., to approximately 9:00 p.m., the GCSO and other law enforcement personnel searched the Gallia County area for the reported two dogs and any possible crime scene where the dog attack occurred. The GCSO could not find the dogs or the exact location where the attack reportedly occurred.

43.     On or about June 22, 2019, at approximately 9:00 p.m., the GCSO 911 dispatch center received a telephone call from the mother. The mother advised that she had initially lied about the location of the dog attack. The mother, NATASHA SMITH (SMITH), advised the dog attack had occurred at the home of her boyfriend, VALENTINE, at 2377 Mount Olive Road, Bidwell, Ohio, 45614, specifically on the driveway, directly in front of the garage.

44.     On or about June 23, 2019, VALENTINE met with the GCSO at his mother's residence, 1261 Jackson Pike, Apartment 15, Gallipolis, OH 45631. VALENTINE relinquished the remains of a dead pit bull-type dog contained in two plastic bags. VALENTINE advised that the remains were the dog that attacked SMITH and SMITH's juvenile son. VALENTINE further advised that a "friend" had shot the dog in the head. VALENTINE refused to identify the "friend", became uncooperative with law enforcement, and refused to provide any additional information concerning the dog attack.

45.     On or about June 23, 2019, the GCSO applied for a search warrant for VALENTINE's residence, 2377 Mount Olive Road, Bidwell, Ohio, 45614. The Honorable THOMAS S. MOULTON, JR., Gallia County Court of Common Pleas, Gallipolis, Ohio, approved the search warrant (Case Number 2019-5001). The search of the residence disclosed that the area directly in front of the garage where SMITH had advised the dog attack occurred had been cleaned and power-washed. Because of the cleaning and power washing, the GCSO could not obtain any specific evidence of the dog attack. The GCSO observed approximately forty dogs tied to heavy

14

chains or in dog kennels, a treadmill, and other dog conditioning equipment throughout the property.

46.     On or about June 24, 2019, the GCSO contacted your Affiant and the Ohio Department of Agriculture (ODA). The GCSO advised what they had observed during the search warrant at 2377 Mount Olive Road, Bidwell, Ohio, 45614. Based, in part, on the contacts with your Affiant and ODA, the GCSO applied for additional search warrants for 2377 Mount Olive Road, Bidwell, Ohio, 45614 and the cellular telephone belonging to VALENTINE. The Honorable THOMAS S. MOULTON, JR., Gallia County Court of Common Pleas, Gallipolis, Ohio, approved the search warrants (Case Number 2019-5001).

47.     On or about June 25, 2019, the GCSO and your Affiant served the search warrants. Items seized included, but was not limited to, forty (40) pit bull-type dogs, dog fighting tools, a treadmill, portable dog crates, dog fighting magazines, dog books, canine and other animal medicines, and cellular telephones. The seized evidence was entered into the GCSO evidence room. The dogs were transported to an undisclosed location and administered medical attention as needed.

48.     A veterinarian medically reviewed each of the forty dogs that were seized. All of the dogs were pit bull-type dogs. Eleven of the dogs displayed bite marks, bite mark scars, and/or other injuries consistent with dog fighting or neglect. One such dog, evidence number 27, displayed bite mark scars (some recent) on top of the head, on top of the shoulders, and on both front legs. Based on your affiant's training and experience in dog fighting investigations, your affiant knows that the wounds and/or scars observed on some of the pit bull-type dogs seized from VALENTINE's residence were consistent with dogs used in a dog fighting enterprise.

15



49. On or about July 8, 2019, VALENTINE, through his attorney, voluntarily surrendered all of the seized dogs. By signing the document, VALENTINE acknowledged "I certify that I legally own the animal(s) identified above and that no other person has any rights or interest in the animal(s)."

50. Your Affiant reviewed the evidence seized from VALENTINE's residence. The review determined:

   a. VALENTINE stored some of his pit bull-type dogs in a manner consistent with other persons involved in dog fighting ventures. When stored outside, dog fighters routinely keep their dogs tethered to a large metal chain, attached to the ground. Often these chains are very heavy which continually strengthens the muscles of the dogs. The dogs are chained near each other but just outside of the reach of each other in order to maintain aggression. The chain length is often long enough for the dog to walk in a circle; to see and bark at other dogs, and to enter/exit some sort

16

of shelter. Often, the dogs' continual circular movement on the chain wears down the area surrounding the shelters, exposing the dirt and mud. In addition, the dog shelter is often a 50-gallon plastic barrel turned on its side with a hole cut into it for access or a minimal wooden doghouse.

b. VALENTINE was in possession of documents that disclosed he had imported at least one terrier mix dog from other countries.

c. VALENTINE was in possession of pedigree papers and had registered the pedigrees with known entities that record fighting dog lineage, to include but not limited to AMERICAN DOG BREEDERS ASSOCIATION, Salt Lake City Utah, and BONA FIDE KENNEL CLUB INC., Weldon, NC.

d. VALENTINE was in possession of handwritten notes that outlined a conditioning and feeding regimen often used by dogfighters when preparing their dogs to engage in a contracted fight or match. This conditioning regimen is known as the "keep".

e. VALENTINE was in possession of a book entitled "The Complete Gamedog, A Guide to Breeding and Raising the American Pit Bull Terrier." Chapter one of the book is entitled "The Bust", outlining a dog fighting investigation. Additional chapters outline how to feed/condition dogs, and how to administer veterinary medicines to fighting dogs.

f. VALENTINE was in possession of "underground" magazines including, but not limited to "Sporting Dog Journal," "BULL DOG, For Real Dogmen," and "The Registrar." The "underground" magazines describe and report on recent dogfight details and past results from around the country using coded language. They also

17

describe and advertise various "kennels" or dog breeders who raise dogs for animal fighting purposes.

g.  VALENTINE was in possession of an undated printed document entitled "TREATING YOUR DOG AFTER THE MATCH."  This document, including handwritten drawings, outlines how to administer veterinary medicines and instructions on how to bandage the dog after a dogfight.

h.  VALENTINE was in possession of autographed photographs of pit bull-type dogs from well-known dog fighters and Champion dog breeders "Irish Jerry" and Floyd Boudreaux. Floyd Boudreaux is considered the "godfather" of dog fighting in the United States.

i.  VALENTINE was in possession of video recordings of dogfights and video recordings created by well-known dog fighters, entitled "20 Years of Breeding Secrets" and "The $100 Keep".

j.  VALENTINE was in the possession of a breeding stand used on female pit bull-type dogs.

k.  VALENTINE was in possession of an electric treadmill, intended for use by humans that had been modified to hold a dog in place.  Upon activation of the electric treadmill, the dog would not have been able to choose a speed to run or stop the treadmill at any time.

l.  VALENTINE was in possession of a "jenny mill", aka, "cat mill" used by dogfighters to condition pit bull-type dogs.

 

 

51.     During the course of this investigation, your Affiant reviewed public information available on the internet.  The review determined that GAMEKEEPER KENNELS had a website address of www.gamekeeperkennels.com.  Review of the GAMEKEEPER KENNELS website determined the following:

    a.  Contact telephone number of (740)339-3500.  Your Affiant has been advised by the GCSO that this telephone number was used by VALENTINE.

    b.  Contact email address of www.gamekeeper@yahoo.com.

    c.  The bottom of the home page displayed a disclaimer that stated:

        i.   "Notice:  All the information on this webpage is for entertainment purposes (fictional) and used confidentially.  Persons who do not agree with the material enclosed on the page should exit immediately.  We do not in

19

anyway condone to animal cruelty or illegal activities. This website does not, nor intends to violate the 1976 Animal Welfare Act. Thank you for your cooperation."

During previous investigations of dog fighting ventures, your Affiant has observed similar statements contained in numerous "underground" magazines and internet sites that publish dog fighting results, pit bull-type dogs for sale, dog fighting conditioning tips, and other dog fighting information.

d. Internal links entitled "Studs", "Females", "Pups" and "Yearlings". Review of the links determined that male, female, and juvenile pit bull-type dogs were available for breeding and for sale.

e. Your Affiant "clicked" the internal link entitled "Females". The link listed seven female pit bull-type dogs for sale and/or breeding. Your Affiant "clicked" the photo of a female pit bull-type dog named "HELL MARY". The photo was linked to http://www.thepitbullbible.com and displayed the same photo of "HELL MARY", the breeder of the dog, the owner of the dog (GAMEKEEPER KENNELS), the registered name and other information. Additional review determined a four generation history of "HELL MARY" and numerous references to dogs in its lineage to include, but not limited to, "GR CH" (Grand Champion), "CH (Champion)", "1XW" (1-time winner), "4XW" (4-time winner), "6XW" (6-time winner) and "1XL" (1-time loser).

20



User Name _____ Password _____ [Log in] Help Register
☐ Remember Me?

## ThePit Bull Bible Online APBT Database

| Home | Articles | Drug Index | Forums | Pedigrees | Tutorials | Publications | |
|------|----------|-----------|--------|-----------|-----------|--------------|--|

Bullog Database    Breeding Database    Breeder Database    Owner Database    Subscribe Now!    Advanced Forum Search

🏠 The Ultimate Pedigree Database

Welcome to the Ferrari of all APBT Databases!
We have more and better features than any APBT Resource, anywhere 😊
If this is your first visit, learn how to join this community—and check out all our tutorials!

The Pit Bull Bible Online APBT Database

# GAMEKEEPER KENNELS' HELL MARY



Share 0

| | | | |
|--|--|--|--|
| 3 OFFSPRING | RELATIVES | MEDIA CENTER | |
| BREEDINGS MADE | ADD BREEDING | TEST BREEDING | |

**BREEDING**

| | |
|--|--|
| SIRE NAME: | BBK'S HEADBUSSA (1xW) |
| DAM NAME: | CH BBK'S TRICKBAG |
| BREEDER: | BBK |
| OWNER: | GAMEKEEPER KENNELS |

**PHYSICAL CHARACTERISTICS**

| | |
|--|--|
| SEX: | FEMALE |
| COAT COLOR: | BRINDLE & WHITE |
| NOSE COLOR: | BLACK |
| CHAIN WEIGHT: | 44 LBS |
| CONDITIONED WEIGHT: | 40 LBS |

**DOCUMENTATION**

| | |
|--|--|
| REGISTERED NAME: | GAMEKEEPER KENNELS' HELL MARY |
| LAND OF BIRTH: | USA |
| LAND OF STANDING: | USA |
| DATE OF BIRTH: | 11/22/2012 |

**DATA**

| | |
|--|--|
| DOG ID: | 61581 |
| VIEWS: | 723 |
| CREATED BY GAMEBRED ON | 06/21/2017 |
| LAST MODIFIED | |

| Pedigree Statistics | | |
|---------------------|--|--|
| BBK'S HEADBUSSA (1xW) | 1X | 50.000% |
| P.O.W'S NELLY | 2X | 50.000% |
| BBK'S MOJO (1xW) 📷 | 2X | 50.000% |
| CH BBK'S TRICKBAG | 1X | 50.000% |
| P.O.W'S ASSASSIN (1xD) 📷 | 2X | 25.000% |
| P.O.W.'S LYNN | 2X | 25.000% |
| WARD'S ANNIE MAE | 2X | 25.000% |
| CH HELL ON EARTH'S HUSTLER (3xW) | 2X | 25.000% |
| DARKSIDE'S REE REE | 2X | 12.500% |
| HELL ON EARTH'S BLACK GIRL (1xW) | 2X | 12.500% |
| CH DARKSIDE'S BETA (4xW) | 2X | 12.500% |
| HELL ON EARTH'S ZEKE (2xW, 1xL) 📷 | 2X | 12.500% |
| WILLIAMS' DIABLO 📷 | 2X | 12.500% |
| GR CH GRIT'S HELL BEND (6xW) 📷 | 2X | 12.500% |
| WILLIAMS' OL BIDDY (1xW) | 2X | 12.500% |
| DARK CITY'S DAG MAE | 2X | 12.500% |

**INBREEDING**

| | |
|--|--|
| WRIGHT'S COEFFICIENT: | 43.750% |

**HOW TO REGISTER**

| | |
|--|--|
| USER TYPE: | VISITOR |
| BECOME A MEMBER: | CLICK HERE |



52.    On or about January 27, 2021, in the United States District Court for the Southern Judicial District of Ohio, the Honorable Magistrate Judge Chelsey M. Vascura approved a search warrant (Case Number 2:21-mj-51) for all electronic devices seized from VALENTINE's residence by the GCSO.

53.    Your Affiant reviewed the electronic devices seized from VALENTINE's residence.  The review determined the electronic devices:

    a.    Contained hundreds of images of pit bull-type dogs.  Some of the images displayed pit bull-type dogs with bite mark scarring on their bodies.

    b.    Were used to register pit bull-type dogs with known entities that record the lineage of dogs used in dog fighting.

    c.    Were used to access www.gamekeeperkennels.com.

    d.     Were used to access email at gamekeeper@yahoo.com.

22

     e.   Were used to access message boards related to pit bull-type dogs.

     f.   Were used to research the purchase, sale, and breeding of pit bull-type dogs with known websites who cater to dog fighters.

54.    On or about October 18, 2021, your Affiant and USDA OIG Special Agent Mike Phillips attempted to interview SMITH at the VALENTINE residence, 2377 Mount Olive Road, Bidwell, OH 45631. Your Affiant made contact with VALENTINE, who was working in the side yard of the residence. Your Affiant inquired about SMITH. VALENTINE advised that SMITH was not at home. Your Affiant left a business card with VALENTINE and asked VALENTINE to have SMITH contact him. VALENTINE agreed. Additionally, your Affiant complimented VALENTINE on how nice his property was and how quiet the property was, since the last time your Affiant was at the location it was very noisy with barking dogs. VALENTINE thanked your Affiant for the compliment and advised that the courts had not forbade him from owning or possessing any dogs and that he was planning to obtain additional dogs in the future. At the conclusion of the conversation, your Affiant and Special Agent Phillips left the area.

55.    On or about January 6, 2022, your Affiant interviewed SMITH in the presence of her attorney. Among other questions, SMITH was asked if VALENTINE, her boyfriend and the father of one of her children, currently possessed any dogs. SMITH advised that VALENTINE does not have any dogs at "our house", "my house", "his house" or anywhere else that she is aware. SMITH also confirmed that the dogs previously seized had belonged to VALENTINE, and that VALENTINE had maintained the GAMEKEEPER KENNELS website.

56.    In approximately January 2022, law enforcement identified a Confidential Human Source (Source) who had previously received an ounce of fentanyl from VALENTINE.

57.     On or about January 24, 2022, law enforcement met with the Source.  The Source advised that he/she was to meet with VALENTINE in the area of Bidwell, OH, to repay $2,400 cash and in return would be "fronted" (common street slang for receiving drugs with the intention of repaying the value of the drugs at a later date) one ounce of fentanyl.  A controlled audio and video-recorded undercover transaction was arranged between the Source and VALENTINE.  A Global Positioning Satellite (GPS) tracker was affixed to the Source's vehicle with his/her consent.  The Source and the Source's vehicle was searched for contraband with nothing found.  The Source contacted VALENTINE via cellular telephone number (740)339-2592 advising of his/her timed arrangement for the narcotics purchase.  Law enforcement provided the Source with $2,400 in pre-recorded currency, a covert electronic recording device, and established mobile and air surveillance of the Source.  The air unit video recorded the surveillance.

58.     On or about the same date, the Source met with VALENTINE at the entrance of a rural driveway, near 43 Scenic Drive, Vinton, OH 45686, more specifically GPS Coordinates 38.95065N, 82.3422W (approximately 1 mile from VALENTINE's residence, 2377 Mount Olive Road, Bidwell, OH 45631).  Law enforcement observed the Source enter the passenger side of a Chevrolet Tahoe sitting in the entrance of the rural driveway.  Law enforcement conducted several drive-by surveillances and positively identified VALENTINE sitting in the driver's side of the Chevrolet Tahoe.



59.     On or about the same date, law enforcement observed the Source exit the Chevrolet Tahoe and leave the area.  Mobile surveillance units maintained surveillance of the Source.

60.     The Source met with law enforcement at a predetermined location.  The Source relinquished one ounce of suspected fentanyl and the recording device.  The Source and the Source's vehicle was searched for contraband with nothing found.    The Source advised he/she was to repay VALENTINE $2,400 in exchange for the once ounce of fentanyl he/she had received. The suspected fentanyl, to include original packaging, was weighed by law enforcement at 29.5 grams.  Law enforcement field-tested the substance, which determined a positive indication for the presence of fentanyl.

61.     The aerial surveillance unit maintained surveillance of VALENTINE. VALENTINE, immediately following the narcotic transaction, was observed driving the Chevrolet Tahoe through the gate, up a steep hill, to the end of the driveway, specifically to GPS Coordinates

25

38.9514N, 82.32603W. At the end of the driveway, VALENTINE exited the vehicle, walked around to the passenger door, opened the door, and retrieved unknown items. VALENTINE then walked to a covered structure and reached toward the outside rafters of the structure. VALENTINE entered the structure, which contained what appeared to be kennels, fences and dogs inside the fences. VALENTINE entered his vehicle and exited his vehicle several times, during this surveillance. VALENTINE entered the structure and fences numerous times as well. It is unknown what VALENTINE was doing inside the structure. VALENTINE also walked to the rear and side of the structure where numerous dogs were observed attached to chains that were secured to the ground. Numerous doghouses could also be observed within the wooded area behind the structure.

62.     On or about the same date, the aerial surveillance unit observed VALENTINE enter the Chevrolet Tahoe, proceed down the long driveway, and travel to his residence, 2377 Mount Olive Road, Bidwell, OH 45631. VALENTINE exited the Chevrolet Tahoe and entered the residence through a garage door.

63.     Your Affiant reviewed the Ohio Law Enforcement Gateway (OHLEG) for Ohio Bureau of Motor Vehicle (BMV) records relating to VALENTINE. The review determined that VALENTINE possessed a valid Ohio driver's license and reported that he resided at 1261 Jackson Pike, Apartment 15, Gallipolis, OH 45631. Additional review determined that VALENTINE has a Beige 2005 Chevrolet Tahoe SUV (VIN 1GNEK13T15R258517) registered to him using the address of 1261 Jackson Pike, Apartment 15, Gallipolis, OH 45631. Investigation has determined that this address is the residence of VALENTINE's mother, OTHELLA L. CLOSE.

64.     Your Affiant reviewed the video recorded by the aerial surveillance unit on or about January 24, 2022.  The review determined that the structure was located at approximate GPS Coordinates 38.9514N, 82.32603W.  Additional review determined:

a.   The structure appeared to be made of metal and wood.

b.   The structure contained approximately six dogs, within separate fenced in areas.

c.   The fenced in area contained what appeared to be minimal housing for the dogs.

d.   One dog was tethered to a chain near the driveway, in front of the structure.  This dog had access to minimal housing.  A circle in the snow and mud could be observed, where the dog continuously drug the chain on the ground.

e.   Many dogs could be observed in the wooded area behind the structure.  These dogs appeared to be tethered to chains affixed to the ground and appeared to have minimal housing.  Some of the ground around chained dogs displayed circles in the mud and snow where the dogs continuously drug the chains on the ground.

f.   All of these dogs are being housed in a manner consistent with what your Affiant observed during the service of the search warrant on VALENTINE's residence in June 2019 and in other dog fighting enterprise investigations.  Specifically, dogs used in animal fighting ventures are housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent. Dog fighters often take steps to house fighting dogs away from public view, such as by placing them at the back of property lines, inside sheds, garages, barns, or basements, or by erecting tall opaque fences around areas where fighting dogs are housed.  When stored outside, dog fighters routinely keep their dogs tethered to a large metal chain, attached to the ground.  Often these chains are very heavy

27

which continually strengthens the muscles of the dogs.  The dogs are chained near each other but just outside of the reach of each other in order to maintain aggression. The chain length is often long enough for the dog to walk in a circle; to see and bark at other dogs, and to enter/exit some sort of shelter.  Often, the dogs' continual circular movement on the chain wears down the area surrounding the shelters, exposing the dirt and mud.  In addition, the dog shelter is often a 50-gallon plastic barrel turned on its side with a hole cut into it for access or a minimal wooden doghouse.

g.    The below photographs depict the kennel/structure location along with the Chevrolet Tahoe at the bottom of the photograph.  The second photograph is an infrared photograph that depicts the heat signature of dogs inside the kennel and in the wooded area.





65.     On or about February 7, 2022, law enforcement conducted surveillance of 2377 Mount Olive Road, Bidwell, OH 45631.  Law enforcement observed a white truck, pull into the driveway of the residence.  A person, believed to be VALENTINE was observed exiting the white truck and entering the residence through the right most garage door with a bag in his hand.   Aerial surveillance determined that the white truck was parked in the driveway next to a maroon sedan and a dark colored Jeep Wrangler.



66.     On or about the same date, law enforcement met with the Source.  The Source
advised that he/she was to meet with VALENTINE in the area of Bidwell, OH, to repay $2,400
cash from the January 24, 2022 transaction and in return would be "fronted" (common street slang
for receiving drugs with the intention of repaying the value of the drugs at a later date) fentanyl.
A controlled audio and video-recorded undercover transaction was arranged between the Source
and VALENTINE.  A GPS tracker was affixed to the Source's vehicle with his/her consent.  The
Source and the Source's vehicle was searched for contraband with nothing found.  The Source
contacted VALENTINE via cellular telephone number (740)339-2592 advising of his/her timed
arrangement for the narcotics purchase.  Law enforcement provided the Source with $2,400 in pre-
recorded currency, a covert electronic recording device, and established mobile surveillance of the

Source.  The aerial surveillance unit established surveillance of 2377 Mount Olive Road, Bidwell, OH 45631 and video recorded the surveillance.

67.     On or about the same date, the aerial surveillance unit observed VALENTINE exit the residence and enter a white Dodge truck. The vehicle had a large white circular shaped water tank in the bed of the truck.  VALENTINE traveled from his residence to the entrance of a rural driveway, near 43 Scenic Drive, Vinton, OH 45686, more specifically GPS Coordinates 38.95065N, 82.3422W (approximately 1 mile from VALENTINE's residence, 2377 Mount Olive Road, Bidwell, OH 45631).  This meeting location was the same location used by VALENTINE on or about January 24, 2022.



68.    On or about the same date, law enforcement observed the Source arrive at the entrance of the rural driveway where VALENTINE was parked.  VALENTINE exited the white Dodge truck and met with the source at the driver's window of the Source's vehicle.  After a brief meeting, VALENTINE reentered the White Dodge truck.  The Source left the area.

69.    Mobile surveillance units maintained surveillance of the Source.  The Source met with law enforcement at a predetermined location.  The Source relinquished two ounces of suspected fentanyl and the recording device.  The Source and the Source's vehicle was searched for contraband with nothing found.   The Source advised he/she was to repay VALENTINE $4,800 in exchange for the two ounces of fentanyl he/she had received.  The suspected fentanyl, to include the original packaging, was weighed by law enforcement at 56.68 grams.  Law enforcement field-tested the substance, which determined a positive indication for the presence of fentanyl.

70.    The aerial surveillance unit maintained surveillance of VALENTINE.  Immediately following the narcotics transaction, VALENTINE was observed driving the white Dodge truck through the gate, up a steep hill, to the end of the driveway, specifically to GPS Coordinates 38.9514N, 82.32603W.  This was the same location visited by VALENTINE following the narcotics transaction on January 24, 2022.  At the end of the driveway, VALENTINE exited the vehicle, walked around to the passenger door, opened the door, and retrieved unknown items. VALENTINE then walked to the covered structure and entered.  It is unknown what VALENTINE was doing inside the structure.  VALENTINE also walked to the rear and side of the structure where numerous dogs were observed attached to chains that were secured to the ground. Numerous doghouses could also be observed within the wooded area behind the structure.

71.    Your Affiant reviewed OHLEG for Ohio BMV records relating to VALENTINE. The review determined that VALENTINE possessed a valid Ohio driver's license and reported

that he resided at 1261 Jackson Pike, Apartment 15, Gallipolis, OH 45631.  Additional review determined that VALENTINE has a white 2006 Dodge Truck (VIN 1D7HU18N965633581) registered to him using the address of 1261 Jackson Pike, Apartment 15, Gallipolis, OH 45631. Investigation has determined that this address is the residence of VALENTINE's mother, OTHELLA L. CLOSE.

72.     Your Affiant reviewed the video recorded by the aerial surveillance unit on or about February 7, 2022.  The review determined that the structure was located at approximate GPS Coordinates 38.9514N, 82.32603W and was the same location that VALENTINE visited on or about January 24, 2022.  Additional review determined:

    a.   The structure, kennels, number of dogs inside and outside, to include the wooded area, appeared to be the same as on or about January 24, 2022.

    b.   The manner in which these dogs were chained and housed appeared to be the same as on or about January 24, 2022.

    c.   VALENTINE entered and exited the white Dodge Truck many times.

    d.   VALENTINE entered and exited the structure many times.

    e.   VALENTINE appeared to use the circular white water tank and hose in the back of the white Dodge truck to water the dogs inside the kennel.



73.     Your Affiant reviewed publicly available information to include Google Earth and Bing mapping for GPS Coordinates 38.9514N, 82.32603W.  The review determined the location to be approximately 0.3 miles from the intersection of Summit Road and Scenic Drive, Gallia County, Vinton, OH.  Further review determined that 43 Scenic Drive, Vinton, OH was located at the intersection of Summit Road and Scenic Drive, Vinton, OH.



74.    Your Affiant reviewed publicly available records from the Gallia County OH Auditor for 43 Scenic Drive, Vinton, OH 45686.  The review determined that the property was assigned parcel number 01900169703, consists of 42.771 acres, a residence, outbuildings, agriculture land, and is bordered by Scenic Road to the West, Sprague Road to the East, Summit Road to the North, and parcel number 01900167200 to the South.  The property is owned by FREELIN H. WRIGHT (hereinafter referred to as WRIGHT).



75. Your Affiant additionally reviewed publicly available records from the Gallia County OH Auditor, Geographic Information System (GIS) for parcel number 01900169703. Specifically, your Affiant reviewed GIS pictometry dated March 2020. The review determined that the location that VALENTINE visited on or about January 24, 2022 and February 7, 2022, was accessed via a long west to east driveway from Scenic Road that is on parcel number 01900169703 and possibly intrudes on parcel number 01900169702. Further, the review determined that the structure that houses the dogs and some of the dogs in the wooded area behind the structure could possibly intrude on parcel number 01900169702.



76.     Your Affiant reviewed OHLEG for Ohio BMV records relating to WRIGHT, the owner of parcel number 01900169703.  The review determined that WRIGHT possessed a valid Ohio driver's license and reported that he resided at 43 Scenic Road, Vinton, OH 45686.  Additional review determined that WRIGHT and VALENTINE co-own a black 2017 Jeep Wrangler (VIN 1C4BJWFG8HL739267).  The Jeep is registered to VALENTINE at 1261 Jackson Pike, Apartment 15, Gallipolis, OH 45631.

77.     Your Affiant reviewed publicly available records from Gallia County OH Auditor for parcel number 01900169702.  The review determined that the property consists of 6 acres (1 acre of home site area and 5 acres of woodland), and is bordered by Scenic Road to the West, and parcel number 01900169703 to East, North and South.  The property is owned by ROSE E. MCCOY (hereinafter referred to as MCCOY).  Review of sales information determined that in 2007, OTHELLA L. CLOSE, the mother of VALENTINE, sold the property to MCCOY.

37

78.     On or about February 24, 2022, law enforcement conducted surveillance of the rural driveway entrance associated with parcel number 01900169703.   Law enforcement took photographs of the entrance to the rural driveway used by VALENTINE.

79.      On or about, February, 28, 2022, law enforcement conducted aerial surveillance of GPS Coordinates38.9514N, 82.32603W.  The surveillance was video recorded.  Your Affiant reviewed the video recording.  The review determined that the structure was the same location that VALENTINE visited immediately following narcotics transactions on or about January 24, 2022 and on about February 7, 2022.  Further review determined:

a.   The structure, kennels number of dogs inside and outside, to include the wooded area, appeared to be the same as previous aerial surveillances.

b.   The manner in which these dogs were chained and housed appeared to be the same as on previous aerial surveillances.

c.   A close up of the area determined the dogs appeared to be pit bull-type dogs (size, weight, stance).

d.   A close up of the cages within the structure appeared to have gray/reddish flooring similar to the paver bricks observed by your Affiant during the search warrant of VALENTINE'S residence in June 2019.





80. On or about February 28, 2022, your Affiant reviewed website http://www.thepitbullbible.com. The review disclosed that on October 5, 2020, GAMEKEEPER KENNELS created a posting that listed a pit bull-type dog named "AZTECA PRIME"

approximately one year and three months after law enforcement had seized approximately forty dogs from VALENTINE in June of 2019. Review of the posting determined that the dog was presently listed "For Sale." Additional review of the posting disclosed a photograph of the dog in a cage with what appeared to be paver bricks as the floor of the cage, similar to how VALENTINE previously housed some of his dogs at his residence. Further review disclosed a four generation history of "AZTECA PRIME" and numerous references to dogs in its lineage to include, but not limited to, "GR CH" (Grand Champion), "CH (Champion)", "1XW" (1-time winner), "4XW" (4-time winner), "5XW" (5-time winner), "ROM" (Register of Merit), and "POR" (Producer of Record).





81.     On or about March 8, 2022, law enforcement agents from the Federal Bureau of Investigation (FBI) executed a search warrant at 2377 Mount Olive Road, Bidwell, Ohio, 45614. During the search, law enforcement found items consistent with dog fighting, including a pit bull-type dog in a shed next to the residence, a "slatmill" (a treadmill designed for use on dogs) in the basement of the residence, and veterinary-type medicines, and paperwork associated with veterinary-type medicines in the residence.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

82.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT PREMISE'S, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other electronic storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

41

83.     Your Affiant submits that if a computer or electronic storage medium is found in the SUBJECT PREMISES, there is probable cause to believe the records will be stored on that computer or electronic storage medium, for at least the following reasons:

   a.  Based on my knowledge, training, and experience, your Affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can sometimes be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system

42

data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

84. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer or digital storage medium found in the SUBJECT PREMISE'S because:

a. Data on a computer or digital storage medium can provide evidence of a file that was once on the device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record

information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element, or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally,

44

some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user. Lastly, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

c.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a computer or digital storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always

data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

2. In most cases, a thorough search of a premises for information that might be stored on computer or digital storage media often requires the seizure of the physical device and later off-site review consistent with the warrant. In lieu of removing any devices from the premises, it is sometimes possible to make an image copy of such device(s). Imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the device, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, who has used it requires considerable time, and taking that much time on premises could be unreasonable.

46

As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

2. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit seizing, imaging, or otherwise copying computers and digital storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted

47

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.


## **CONCLUSION**

85.     Based upon the evidence set forth in this affidavit, your Affiant respectfully submits that probable cause exists to believe that criminal evidence, contraband, fruits of crime, items illegally, possessed and property used, intended to be used or otherwise used in committing violations of  7 U.S.C. §2156(b)  will be found at the following subject premises:

    a.     The residence located at 2377 Mount Olive Road, Bidwell, Ohio, 45614 ("SUBJECT PREMISES") described in detail in Attachment A.

86.     Based also upon the evidence set forth in this affidavit, your Affiant respectfully requests the issuance of search warrants for the above referenced premises, and any vehicles on said premises.

## **REQUEST FOR SEALING**

87.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  Your Affiant submits and believes that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations, as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that, criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.


Respectfully submitted,

Digitally signed by MARK
BARNHART
Date: 2022.03.08 10:09:36 -05'00'

Mark A. Barnhart
Special Agent
USDA-OIG-I


Subscribed and sworn to before me
on March ___8___, 2022

Chelsey M. Vascura
United States Magistrate Judge
United States District Court, Southern Judicial District of Ohio